UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE

CIVIL ACTION NO. 7:10-87-KKC

CHESAPEAKE APPALACHIA, LLC,                                            PLAINTIFF

v.                          **MEMORANDUM OPINION AND ORDER**

KEVIN WILLIAMS,                                                        DEFENDANT

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Chesapeake Appalachia's Motion for Partial Summary Judgment [DE 99] and Kevin Williams's Motion to Dismiss [DE 100]. For the reasons set forth below, Chesapeake's Motion for Partial Summary Judgment is **GRANTED**, and Williams's Motion to Dismiss is **DENIED**.

## BACKGROUND

Chesapeake Appalachia, LLC ("Chesapeake") is a natural gas producer and successor lessee to an oil and gas lease dated September 21, 1951 (the "J.S. Cline Lease"). Under the terms of the lease, Chesapeake has the following rights:

> searching for, exploring, drilling and operating for and marketing oil and gas, and of laying pipe lines, and building tanks, stations, telephone, telegraph and electric power lines, houses for gates, meters and regulators with all other rights, privileges, appliances and structures necessary, incident or convenient for the operation of this land alone and conjointly with neighboring lands . . . .

[DE 1-1 at 1].

In October 2006, Chesapeake drilled a natural gas well, Well No. 825727, and constructed a well access road on the leased premises. At that time, Beluah Elswick owned the

property's surface rights. In February 2009, more than two years after construction of the well, Kevin Williams purchased the surface rights from Elswick for $21,500. Since then, Williams and Chesapeake have had a series of disagreements about their respective property rights and their obligations to each other.

In July 2010, Chesapeake initiated this action seeking injunctive relief against Williams because Williams placed a lock on the entrance gate to the well access road blocking Chesapeake's access to the well. [DE 1]. In March 2011, Chesapeake amended its Complaint alleging that Williams damaged a different well access road by improperly removing drain tiles. [DE 27].

In June 2011, Williams began construction of a barn on the well location less than 20 feet from the wellhead. The Court issued a preliminary injunction allowing Chesapeake to remove the barn and enjoining Williams from further interference with Chesapeake's operation of the well. [DE 44]. At Williams's request, the Court amended the injunction allowing Williams to maintain an electric fence on the well location. [DE 53]. In November 2011, Williams was held in contempt of Court for violating the preliminary injunction by restricting Chesapeake's access to the well access road. [DE 74]. As sanctions for violating the injunction, Williams was ordered to pay Chesapeake's costs. [DE 95].

Chesapeake moves for summary judgment on six issues. First, Chesapeake seeks a judgment that Williams's placement of structures on the well location interferes with the well's operation.  Second, that Williams's use of the well location for his barnyard animals to feed and roam interferes with Chesapeake's operations. Third, that Williams's placement of a fence in the well access road's ditch lines interferes with Chesapeake's operations. Fourth, that Williams's use of the well access road as a concentrated feeding station for his animals interferes with

2

Chesapeake's operations and right of way. Fifth, that Williams is liable to Chesapeake for its costs to remove the partially constructed barn from the well location. Sixth, that Williams is not entitled to royalties for gas or oil production from Well No. 825727. [DE 99-16 at 1].

Williams's Motion to Dismiss cites evidence beyond the pleadings and will be construed as a motion for summary judgment. *See Himes v. United States*, 645 F.3d 771, 776 (6th Cir. 2011). Williams seeks a judgment that he is not liable for Chesapeake's costs for removing the barn and that he is entitled to royalties for gas and oil production from Well No. 825727. [DE 100 at 1].

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to show that a particular fact is disputed, a party must cite to "particular parts of materials in the record." Fed. R. Civ. P. 56(c). A party opposing a motion for summary judgment cannot "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A scintilla of evidence in support of the plaintiff's position is not enough because there must be enough evidence to allow a jury to reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering a motion for summary judgment, the court must view the facts contained in the record and draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587. What the court must ultimately determine is whether there is a sufficient dispute about the evidence to require submission to the jury, or

whether the evidence favors one side so strongly that it is entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 251-52.

## DISCUSSION

First, the Court must determine the proper legal relationship between Chesapeake and Williams. Then, the Court will examine whether there is a genuine issue as to any material fact and whether a party is entitled to judgment as a matter of law.

**I. Law**

Kevin Williams owns the surface rights to the property in issue. Chesapeake also owns rights to the property. The parties dispute what rights they have and what duties they have to each other. Williams purchased the surface rights to the land subject to Chesapeake's property rights. Just as someone may not trespass on another's property, Williams cannot engage in conduct that violates Chesapeake's property rights. By virtue of the J.S. Cline Lease, Chesapeake owns the right to "serach[], drill[] and operat[e]" oil and gas wells on the property. [DE 1-1 at 1]. Prior to selling the land to Williams, Elswick executed a surface owner agreement in which she confirmed that she had "reviewed the [permit] application and the information submitted with th[at] form, and agree[d] to the well operator's operations and reclamation set forth herein." [DE 99-3 at 2]. Chesapeake's permit application identifies the construction location of the well and the land application area for the well location. [99-4 at 25-26, 55-60]. The surface owner agreement was included in Chesapeake's permit application and available for public review when Williams purchased the property. [99-4 at 56]. Additionally, Chesapeake and Elswick signed a Right of Way Agreement that gave Chesapeake "the right to construct, maintain, operate, replace or alter the size of . . . pipelines for transporting gas or fluids . . . and

4

appurtenant above ground facilities; . . . to perform necessary pre-construction work; and to have reasonable right of way ingress to and egress from its facilities across lands herein described or on lands contiguous thereto . . . ." [DE 99-6 at 2]. The agreement "benefit[s] and bind[s] . . . their heirs, successors, and assigns." [DE 99-6 at 3]. Williams does not attack the validity of any of these agreements. He objects to their scope and application to his activities.

When Williams purchased the property, he took the property subject to the J.S. Cline Lease, the surface owner agreement, the well permit and the Elswick Right of Way Agreement. *See Duvall v. 20th Century Coal Co.*, 104 F. Supp. 725, 728 (W.D. Ky. 1952) ("One who purchases real estate takes the property with all of the inconveniences or circumstances attached to it.")

Here, Chesapeake owns an easement and is the dominant tenement. Williams is the servient tenement. This is not to say that Williams gave up his right to use his property as he sees fit. Williams's use, however, must "not interfere with the use of the dominant tenement." *Meade v. Ginn*, 159 S.W.3d 314, 317 (Ky. 2004). Chesapeake and Williams "have correlative rights and duties which neither may unreasonably exercise to the injury of the other." *Higdon v. Kentucky Gas Transmission Corp.*, 448 S.W.2d 655, 657 (Ky. 1969). Additionally, Chesapeake "shall not utilize any more of the surface estate than is reasonably necessary for exploration, production and development of the mineral estate." K.R.S. § 353.595(5).

It is uncontested that Chesapeake owns the right to access, operate and maintain its gas well. Williams is prohibited from interfering with Chesapeake's right to access, operate and maintain its well. Chesapeake argues that Williams engaged in or is engaging in various conduct that interferes with its well operations. The issue for the Court is to determine whether Chesapeake cites sufficient evidence that Williams's conduct interferes with its operation. If so,

5

then Williams must cite evidence in the record that creates a genuine dispute of material fact. Stated another way, if Chesapeake cites evidence that Williams's conduct interferes with their operations or right of way, then Williams must cite evidence that the conduct does not interfere with Chesapeake's operations or else Chesapeake is entitled to judgment as a matter of law.

## II. Analysis

### A. Placing Structures on the Well Location

Chesapeake argues that the entire well location is needed to operate Well No. 825727. The well location is a flat section of land, 189 feet by 63 feet, carved into a hillside. [DE 76-1, Expert Report of Mike Hall]. The well location is accessible only by the well access road. Mike Hall, an expert in the operation and servicing of natural gas wells, details the equipment required to operate and service the well. For example, to service the well, Chesapeake must place a service rig and tractor trailer on the well location positioned on either side of the wellhead. [DE 76-1 at 2, DE 76-5]. The service rig has a 65 foot tall mast that must be secured to the ground by cables that may extend 100 feet from the mast. [DE 76-1 at 2]. Due to the terrain and layout of the well location, the hillside and ditch line on the back of the location and the outslope of the front of the location, there are limited placement opportunities for the servicing rig. [DE 76-1 at 2, 76-5]. Mike Hall opines that the "positioning and size of the barn constructed by Kevin Williams did not leave enough room on either side of the barn to allow the service rig to maneuver around the barn." [DE 76-1 at 2]. Additionally, "the location of the barn would not allow the service rig to be placed into position to service the well." [DE 76-1 at 2].

Mike Hall also details the need, process and equipment required for swabbing and plugging the well. Swabbing the well is required because the well produces fluid. Eventually, Chesapeake must plug and abandon the well. Swabbing and plugging involve large equipment

6

that must be placed into specific locations. According to Mike Hall, a barn could not be placed on the well location without interfering with swabbing the well. [DE 76-1 at 3]. Similarly, Mike Hall opines that "[i]f Kevin Williams constructs a barn anywhere on the location, Chesapeake will not have the necessary space needed for the equipment necessary to plug Well No. 825727." [DE 76-1 at 3-4]. Quite simply, Mike Hall believes that "there is no place upon the well location where Kevin Williams could construct a barn without interfering with Chesapeake's well operations." [DE 76-1 at 4]. Chesapeake has presented sufficient and compelling evidence that the placement of structures on the well location will interfere with the well's operation.

  Williams cites no evidence to support his argument that the placement of structures on the well location would not interfere with Chesapeake's well operations. Instead, Williams argues that the use of the well location is "one of reasonableness" and that a jury should decide if a barn can be placed on the well location. [DE 108 at 5]. To survive summary judgment, however, Williams must cite evidence that Chesapeake's operations are unreasonable or that the construction of a barn or similar structure would not interfere with Chesapeake's operations. Williams cites a number of photographs of other natural gas structures in eastern Kentucky that "show that the assertions of Mr. Hall do not reflect reality." [DE 108 at 4]. Ignoring the obvious issues of authentication and the fact that the photographs were produced after the close of discovery, the photographs fall far short of creating a genuine issue of material fact.

  A fact is material if its resolution affects the ultimate issues in the case. *See Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). The issue here is whether a structure on the well location will interfere with the operation of Well No. 825727. The photographs are not evidence about the operational requirements of Well No. 825727. Williams argues that the pictures depict other wells that are acceptable to Chesapeake with "far less room

7

around the gas well/facilities." [DE 108 at 4]. None of the photographs, however, depict a scenario like the well location here — limited access, sloped terrain above and below the location, a history of fluid production in the well, limited space for equipment, and use of the well location as a concentrated animal feeding operation. The fact that other gas wells have structures within twenty feet of a wellhead is not evidence that a structure within twenty feet of Well No. 825727 would not interfere with its operation. Well No. 825727 is uniquely situated and Williams must present evidence that a structure on the well location will not interfere with Well No. 825727's operation.

Chesapeake's evidence also demonstrates that they are not using "any more of the surface estate than is reasonably necessary for exploration, production and development of the mineral estate." K.R.S. § 353.595(5). Williams presents no evidence, expert opinion or otherwise, that contradicts Mike Hall's opinion that any structure on the well location will interfere with Well No. 825727's operation. Accordingly, Chesapeake's motion for partial summary judgment is **granted** in part and Williams is enjoined from placing permanent structures on the well location.

### B. Use of the Well Location as a Concentrated Animal Feeding Station or a Pasture

Williams allowed his cows, pigs and goats to graze on the well location and use the partially constructed barn for shelter. Chesapeake argues that allowing animals to graze on the well location or using the well location as a concentrated feeding location would interfere with the well's operation. Chesapeake's expert, Dr. Ziemkieticz, opines that "[s]evere overgrazing and trampling are likely to result from development of a Concentrated Animal Feeding Operation on the wellpad." [DE 78-1 at 6]. Dr. Ziemkieticz examined the well site and concluded that "[a]ny actions that concentrate livestock on the site will compromise the integrity of that erosion controlling vegetation cover." [DE 78-1 at 7]. Because Chesapeake is required to

maintain erosion controlling vegetation cover on the site, Dr. Ziemkieticz concludes that any activity that would concentrate livestock on the well pad, such as installation of a barn or a supplemental feeding operation will interfere with Chesapeake's well operations and erosion control.

Chesapeake also relies on Mike Hall's expert opinion that provides a separate justification to keep barnyard animals off the well location. Mike Hall opines that livestock are known to rub up against the metal on drips, a portion of the wellhead, causing the drips to break, creating a safety hazard. [DE 76-1 at 4].

Williams does not cite evidence that creates a genuine issue of material fact about whether using the well location as a concentrated feeding station or pasture would interfere with Chesapeake's well operations. Williams suggests that the well location could be graveled to prevent soil erosion from animals and cites pictures of graveled Chesapeake well sites. Williams's argument misses the mark. First, the well permit does not provide for a gravel reclamation, [DE 99-4], so it is not a viable option. Next, Williams argues that "animals will not graze where there is gravel, as opposed to grass," [DE 108 at 6], but cites no evidence to support his argument. Argument is not evidence. There is no evidence in the record to support Williams's assertions that graveling the well location is a viable option, that animals will not graze or roam on gravel, or that animals grazing or roaming on the gravel will not cause erosion of the well location as detailed in Dr. Ziemkieticz's expert report.

Again, Williams supplies pictures of other well locations where animals are allowed to roam/graze around a gas well. Chesapeake does not argue that animals can never be permitted to graze around a well, only that animals cannot graze around Well No. 825727. Chesapeake cites evidence in the form of expert testimony that the well location cannot sustain a concentration of

9

livestock. Other well sites may be able to sustain grazing livestock. Williams cites no evidence that using the well location as a feeding station or pasture will not harm Chesapeake's operations. Williams argues that a fence or barrier enclosing the wellhead will protect the wellhead from animals. This may be correct, but does not address the issue of hillside erosion if animals are allowed to graze or roam on the well location.

Williams argues that it is the "desired result of Chesapeake" to obtain a finding "that animals cannot even set foot on the area of the 'well location.'" Chesapeake does not ask for such a judgment and the Court will not enter such a judgment. Chesapeake seeks, and the Court will grant, "summary judgment on [the issue of] using the well location as a feeding station and as a place for the livestock to roam and forage." [DE 99-16 at 9]. Williams is enjoined from using the well location as a concentrated feeding station or a place for his livestock to roam and forage.

### C. Fence In the Ditch Line of the Well Access Road

Chesapeake argues that the electric fence in the ditch line along the well access road interferes with its well operations and the Elswick Right of Way Agreement because the fence prevents Chesapeake from maintaining the ditch line pursuant to its permit obligations and its equipment cannot pass the fence without tearing out the fence. Chesapeake relies on Mike Hall's expert report which states that the servicing and/or swabbing equipment "cannot possibly pass without tearing out the fence" and that the "ditch line along the upper portion of the well access road cannot be maintained with the current placement of the fence." [DE 76-1 at 4].

Williams argues that the well access road is 13 feet wide and the gate at the entrance to the well access road is 12 feet wide, so any vehicle that can get through the gate can travel along the well access road without tearing the fence. Although Williams offers some evidence that the

10

fence would not prevent servicing and swabbing equipment from traveling on the well access road, Williams offers no evidence to rebut Mike Hall's conclusion that the fence prevents Chesapeake from maintaining the ditch line. Chesapeake's permit requires it to maintain the ditch line. The undisputed evidence shows that the fence in the ditch line prevents Chesapeake from fulfilling its permit obligations and interferes with their operations. Therefore, Chesapeake's motion is **granted**, and Williams is required to move the fence out of the ditch line along the well access road.

### D. Placement of a Concentrated Feeding Station Near the Well Access Road

Williams has placed a trailer to act as a barn and feeding station on the berm of the well access road along the slope of the hillside adjacent to the road. Williams also stores heavy equipment in the trailer. Chesapeake seeks a judgment that Williams's use of the berm of the well access road as a barnyard, concentrated feeding operation and storage location for heavy equipment interferes with its operations and the Elswick Right of Way Agreement.

Chesapeake argues that because of the feeding station, animals have destroyed the vegetation on the well access road and the road is completely covered in mud. Chesapeake's production foreman states that the well access road is traversable only by four-wheel drive vehicles so the well and well location are accessible only by four-wheel drive vehicles. Additionally, Chesapeake's permit requires it to maintain sediment control and Williams's "placement of the trailer and feeding station . . . places Chesapeake at risk of non-compliance with its permit conditions." [DE 99-16 at 12]. Chesapeake argues that "[t]his risk, along with the obvious damage to the road vegetation and sediment control, demonstrates" Williams's interference with Chesapeake's operations. [DE 99-16 at 12]. Chesapeake argues that Dr.

11

Ziemkiewicz's opinion that overgrazing and trampling are likely to result if a concentrated feeding operation is placed on the well pad applies to the well access road as well.

Williams argues that without the feeding station, it is not certain that grass would grow along the road because the road, like many in eastern Kentucky, was in poor condition before the feeding station. However, Williams does not cite evidence in the record to support his argument. Argument is not evidence and to survive summary judgment Williams must cite evidence in the record that creates a sufficient dispute about the evidence to require submission to the jury.

Williams argues that "Chesapeake does not have the right to assert full use and authority of the well access road, much less an area *off* of the access road." [DE 108 at 9]. Williams is correct that Chesapeake does not have "full use and authority" of the well access road and the surrounding area. However, under the right of way agreement, Chesapeake owns the right "to have reasonable right of way ingress to and egress from its facilities across lands herein described or on lands contiguous thereto . . . ." [DE 99-6 at 2]. The undisputed evidence is that Williams's placement of the feeding station adjacent to the well access road severely damaged the road and prevents Chesapeake from having "reasonable right of way ingress to and egress from its facilities" in clear violation of the right of way agreement. Chesapeake has not cited evidence that shows why Williams's storage of heavy equipment interferes with its well operations or its right of way, so at this point Williams is not enjoined from storing heavy equipment adjacent to the well access road.

Accordingly, Chesapeake's motion is **granted** and Williams must remove the trailer from the area around the well access road and is enjoined from using the area adjacent to the well access road as a barnyard or concentrated feeding operation.

E. **Costs of Removing the Barn from the Well Location**

Chesapeake seeks a judgment that Williams is liable for its costs to remove the partially constructed barn on the well location. Williams seeks a judgment that he is not liable for the costs of removal.

As previously discussed, the construction of a barn on the well location interferes with Chesapeake's operations and violates the terms of its lease. Williams's construction of the barn interfered with Chesapeake's property rights. As a result, Chesapeake suffered $2,437.44 in damages because it had to remove the barn from the well location. [DE 99-15 at 1].

Williams argues that he is not prohibited from building a structure on the well location. As discussed above, his actions "interfered with the use of the dominant tenement" and violated the terms of the lease. Next, Williams argues that "Chesapeake has obtained its desired result" and "[t]he means of achieving that result should be borne by Chesapeake" because "Williams has rights as a landowner to utilize his property and the partial construction of the barn . . . [was] not done in derivation of any law or document governing the land at issue."

Williams does not have the right to interfere with Chesapeake's operations and if he interferes with their operations, he is liable for the damages that he causes. By constructing a barn less than 20 feet from the wellhead, Williams interfered with Chesapeake's operations in violation of the terms of the lease, and Chesapeake suffered $2,437.44 in damages as a result. Therefore, Chesapeake's motion for summary judgment in the amount of $2,437.44 is **granted** and Williams's motion that he is not liable for the costs to remove the barn is **denied.**

F. **Royalties from Well No. 825727**

Williams asserts in a counterclaim that he is entitled to royalties from Well No. 825727.

Chesapeake seeks a judgment that Williams is not so entitled and Williams seeks a judgment that he is entitled to royalties. Chesapeake provides an expert opinion that Well No. 825727 is located in the J.S. Cline Heirs Tract 16, the tract set forth in the J.S. Cline Lease. [DE 77-1]. Williams has no interest in that lease. [DE 99-2]. Williams argues that he is owed royalties based on a lease signed by Elswick that covers the portion of the property where Well No. 825727 is constructed. Williams does not, however, contest the expert opinion that the well lies within the boundaries of the J.S. Cline Heirs Tract 16 and does not offer evidence that Elswick had any mineral rights in Tract 16. Whatever Elswick conveyed to Williams, it undisputedly did not contain the mineral rights in Tract 16. Although the description of the property in the Elswick Lease may include Tract 16, Elswick never owned mineral rights to Tract 16 and could not have conveyed those rights to Williams. Therefore, Chesapeake's motion is granted and Williams's motion is **denied** with respect to whether Williams is owed royalties.

### G. Drain Tiles

In its Third Amended Complaint, Chesapeake alleges that Williams damaged drain tiles from under a second well access road. Williams claims that the drain tiles were "stopped up and were washing out the road" and that he notified Chesapeake of the problem and the situation was not corrected. [DE 100 at 3]. Williams says he "needed to take out the tile to repair the road before further damage was done to the area." [DE 100 at 3].

Williams does not cite any law that entitles him to summary judgment on these facts. Whether Williams's version of the events is true and if his actions are justified under the circumstances are issues of fact that cannot be resolved on summary judgment. Therefore, Williams's motion for summary judgment that he is not liable for damaging the storm tiles is **denied**.

14

## CONCLUSION

For the foregoing reasons, Chesapeake's Motion for Partial Summary Judgment is granted, and Williams's Motion to Dismiss is denied.

It is **ORDERED** that:

1) Chesapeake's Motion for Partial Summary Judgment [DE 99] is **GRANTED** and

2) Williams's Motion to Dismiss [DE 100] is **DENIED.**

Dated this 13th day of June, 2012.

Signed By:
*Karen K. Caldwell*
United States District Judge